USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/06/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v.-

MIGUEL ABREU,

                Defendant.

23-CR-0067 (NSR)
OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge:

Defendant Miguel Abreu ("Defendant") was charged on February 6, 2023, with one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). (ECF No. 27). On July 24, 2023, Defendant filed a motion to dismiss Indictment pursuant to Federal Rules of Criminal Procedure 12 challenging the constitutionality of 18 U.S.C. § 922(g)(1). (ECF No. 36). For the following reasons, Defendant's motion to dismiss is DENIED.

## BACKGROUND

The Complaint alleges that on or about June 29, 2022, Putnam County Sherriff's Department ("PCSD") officers responded to a report of a physical dispute in the vicinity of Jeanne Drive in Putnam Valley. (ECF No. 3 at ¶ 3). Upon arrival, PCSD officers spoke with an individual ("Individual-1") who stated that Individual-1 had a verbal argument that became a physical altercation with an unknown male, the Defendant,[1] when they tried to pass each other on a particularly narrow part of Jeanne Drive. (*Id.*). After informing the PCSD officer of what occurred, Individual-1 provided the PCSD officer with a description and license plate number for the vehicle involved in the altercation (the "Vehicle"). (*Id.*). Using the license plate number, PCSD officers

---

[1] The Complaint refers to Defendant as "Individual-2." (ECF No. 3 at ¶ 3).

1

identified the Vehicle and subsequently obtained photographs of the operator of the vehicle, who Individual-1 confirmed was Defendant. (*Id.*).

While the PCSD officers spoke with Individual-1, other PCSD officers spoke with members of the community who witnessed the incident, including one individual who had video footage of Defendant recorded by a doorbell camera. (*Id.*). Upon review of that footage, Individual-1 confirmed that the male in the video was Defendant. (*Id.*).

At or around the same time, Westchester County Police Department ("WCPD") officers identified the Vehicle using its license plate and description, and conducted a traffic stop of the Vehicle in Mount Kisco, New York. (*Id.*). WCPD officers identified the registered owner and operator of the vehicle as Defendant. (*Id.*). Defendant admitted he was involved in a physical altercation with Individual-1 and that he had a firearm in the Vehicle. (*Id.*). With Defendant's consent, the officers then impounded and searched the Vehicle, at which point the officers recovered the firearm from the Vehicle's trunk. (*Id.*).

Shortly thereafter, officers conducted a *Mirandized* interview of Defendant, during which Defendant gave a description of the incident that aligned with the earlier description Individual-1 gave to officers. (*Id.*). Defendant stated that he was driving in Putnam Valley, New York on Jeanne Drive when an SUV driving towards him moved into his lane, causing him to swerve off the road. (*Id.*). Defendant stated that both vehicles then stopped, Individual-1 approached him, and a verbal argument began. (*Id.*). Defendant stated that Individual-1 was too close to him, so Defendant pushed him away, and then Individual-1 charged at him. (*Id.*). Defendant stated he then pushed Individual-1 to the ground, at which point Defendant could see that Individual-1 had a gun in his/her waistband. (*Id.*). Defendant stated that "because he was afraid of being shot by the gun," he took the gun from Individual-1's waistband and fled. (*Id.*). Defendant stated that, "to render the

2

gun safe, he removed the bullet from the gun's chamber and placed that bullet into the gun's magazine, and then he secured the gun in the trunk of his car." (*Id.*).

Defendant's criminal history record indicates that on or about July 20, 2015, Defendant plead guilty in Chenango County Court to third-degree criminal possession of a controlled substance with the intent to sell, in violation of New York Penal Law § 220.16. (*Id.* at ¶ 4). Defendant was sentenced to five years' imprisonment and 2 years' supervised release. (*Id.*). Defendant was charged with knowingly possessing a firearm after having previously been convicted in court of a crime punishable by imprisonment for a term exceeding one year. (ECF No. 27, at ¶ 1).

## LEGAL STANDARD

The Second Amendment to the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "In *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)," the Supreme Court held that "the Second and Fourteenth Amendments protect the rights of ordinary, law-abiding citizens to possess a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022).

*Bruen* set forth a new framework for analyzing Second Amendment claims: (1) "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct . . ." and therefore, (2) "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. In other words, at the second step, "the government must affirmatively prove that its firearms regulation is

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

"When confronting . . . present-day firearm regulations, [the] historical inquiry that courts will conduct will often involve reasoning by analogy . . . ." *Id.* at 2132. Such reasoning requires "that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133 (emphasis in original). Relying on *Heller* and *McDonald*, the Supreme Court further directed lower courts to focus their analysis on at least two "metrics" when analyzing firearm regulations: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* That is, courts must consider: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that burden is comparably justified." *Id.*

The Supreme Court has also identified historical sources enacted around the time the Second (1791) and Fourteenth (1868) Amendments were adopted as particularly instructive, noting that:

> when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope that they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to reac[h] back to the 14th century for English practices that prevailed up to the period immediately before and after the framing of the Constitution. It is quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies.

*Id.* at 2136 (internal quotations and citations omitted).

> Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of how

4

> the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation. We therefore examined a variety of legal and other sources to determine *the public understanding* of [the Second Amendment] after its . . . ratification. And, in other contexts, we have explained that a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution.

*Id.* (internal quotations and citations omitted) (emphasis in original).

Lastly, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

**DISCUSSION**

Here, Defendant argues 18 U.S.C. 922(g)(1) is unconstitutional facially and as-applied to Defendant. (Def.'s Mot. to Dismiss at p. 2-3). Defendant argues that (1) felons, including Abreu, are among "the people" the Second Amendment protects; (2) the plain text of the Second Amendment covers Abreu's alleged conduct; and (3) the government has not met its burden of identifying historical traditions prohibiting felons from possessing firearms. (*Id.* at p. 2-9). In opposition, the Government argues that felons do not fall within "the people" protected by the Second Amendment, which are limited to "ordinary, law-abiding, adult citizens." (Gov't Opp. at p. 10-14) (citing *Bruen*, 142 S. Ct. at 2134). The Government further argues that the nation has a historical tradition of disqualifying certain categories of individuals from possessing firearms, and in support cited to laws and legal principles from 15th-century England (*Id.* at 15-16); Colonial America (*Id.* at p. 16-17); the American Revolutionary War (*Id.* at p. 17-18); and debates over the ratification of the Bill of Rights (*Id.* at p. 19-21). At the outset, felons cannot be excluded from

those individuals that are part of the "national community" that comprises "the people" as described in *Heller*, and therefore are within the scope of protection provided by the Second Amendment. *Heller*, 554 U.S. at 580 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

Given the parties' briefings and its prior opinions, however, this Court is compelled to again agree with the Government that the nation's history contains a "robust tradition" of disarmament of certain groups deemed too "dangerous" to society and those that "deviated from legal norms." *United States v. Jackson*, 69 F.4th 495, 502-05 (8th Cir. 2023); *see Frey et al. v. Nigrelli et al.*, 21-cv-5334, 2023 WL 2473375 (SDNY Mar. 13, 2023); *United States v. White*, 23-cr-00140, 2023 WL 6066201 (Sept. 18, 2023). As the Court noted in *White*, the Government's examples of historical regulations of firearm and ammunition possession are compelling. The English Parliament and some colonial governments disarmed Catholics based on the view that they "are unwilling to obey the government and its laws" following the Glorious Revolution in 1688. *Jackson*, 69 F.4th at 502; *id.* at 502-03 (citing Michael A. Bellesiles, *Gun Laws in Early America, The Regulation of Firearms Ownership, 1607-1794*, 16 LAW & HIST. REV. 567, 574 (1998)). American colonies prohibited certain racial groups from gun ownership due to the perceived danger of non-white races. *See id.* at 502 (citing Bellesiles, *supra*, at 578-79); *see also, United States v. Davila*, 2023 WL 5361799, at *3 (S.D.N.Y. August 22, 2023) (citing Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006)). Finally, state legislatures, with the recommendation of Continental Congress, disarmed non-loyalists during the Revolutionary War. *See, e.g.*, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law); *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass.

law); *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law*)*; *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). This Court is further persuaded by evidence of the American colonies (and then the states) sanctioning estate forfeiture and capital punishment for those individuals convicted of a crime. *See Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020); *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, *J.*, joined by Scalia, *J.*, concurring in the judgment) (describing capital punishment as "ubiquit[ous]" for felony crimes).

An argument that felony disarmament defies tradition is unconvincing where, at the time of the ratification of the Second Amendment, the nation accepted death as punishment for a felony conviction. *Medina v. Whitaker*, 913 F.3d 152, 155 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."). The Government has constructed "a well-established and historical analogue" for §922(g)(1) that disqualifies a discrete group of individuals, felons, identified as a threat to ordered society because of their demonstrated inability to comply with legal norms. *Bruen*, 142 S. Ct. at 2133; *White*, 23-cr-00140, 2023 WL 6066201, at *6 (Sept. 18, 2023).

Defendant's arguments are insufficient to compel the Court to depart from its prior opinions. Accordingly, the Court holds that § 922(g)(1) is consistent with the Second Amendment.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 36.

Dated:  October 6, 2023                                         SO ORDERED:

       White Plains, New York

                                                 NELSON S. ROMÁN
                                          United States District Judge